argument not to repeat 15 minutes per side as their total is named for the interview. Thank you, your honors, for the opportunity to be here today. I'd like to reserve two minutes at the end. You may. Thank you. I'd like to begin by discussing Dr. Gerald Shiner, the primary treating psychiatrist, and specifically two aspects with regard to the evidence that was submitted from Dr. Shiner to Provident in support of my client's long-term disability claim. Because I think they really are, this is by far and away the central point of the entire appeal. Dr. Shiner, number one, refused to provide his progress notes, his monthly progress notes, office notes, from his meetings with my client, citing privacy concerns, but more than privacy concerns, because we all recognize that you're waiving your right to privacy to a large extent when you file a long-term disability claim, especially as to the evidence that supports your long-term disability claim. But also, more importantly to Dr. Shiner was that the sanctity of that clinical setting and not disclosing certain things that might have been said in that setting, he thought were beneficial to Les Gilewski, the plaintiff, and kind of the center point for the treatment progress they were making, that trust that things would not be disclosed. Now, in addition to that, the monthly progress reports that Dr. Shiner was sending to Provident, in retrospect what he was doing was taking Provident's form. When the treatment regimen, prescriptions, things like that weren't changing, he would simply photocopy the form, change the date, rather than redoing the entire form. And I would submit as to that issue, which I think is a non-issue, I don't even know why it's significant or important, so long as it was accurate every time. How about addressing the disparity between the independent physicians and Dr. Shiner? And that's exactly where I'm going. So in the context of what Dr. Shiner knew about what Provident wanted, he's treating an individual who's getting his long-term disability benefits without disruption continuously since mid-2009 when Les Gilewski had a severe psychiatric episode, was hospitalized at Cottage Hospital in Grosse Pointe, Michigan, because he had a plan, a suicide plan, to tie an anchor to himself and jump off a boat. He went into very significant treatment at the hospital and following the hospital. And then I don't want to get too bogged down on the old treatment history, but the progress of the claim was payment without disruption throughout this entire period of time. Dr. Shiner and Les Gilewski, the plaintiff, at no time felt that the claim was in eminent peril or that they were doing anything other than processing paperwork for the LTD carrier. And let's assume... How could he feel that? Because they've got a new psychiatrist who's coming out there and doing all these studies and he must know that something is up when they're not really willing to accept his view of it. And that would be in 2013, and that would be the first time, of course, that, sure, the red flag goes up. Absolutely. I was speaking about the events leading up to that. But even at that point in time, and that's a great question... Let's assume just photocopying the forms and changing the date is fine. It seems to me there's plenty of case law that says, even when we're deciding these things de novo, that we look to see whether the opinions of both of the experts are supported by and consistent with the medical records. There's got to be hundreds of cases that say that. And here we have this unusual, I don't recall another case, where the doctor, for whatever reason, just says, I'm not going to give you the medical records. So that's actually not true. So what I would like to do is put this in context. What isn't true of that? What isn't part of that? In the record at page ID 3642, is the only descriptive conveyance from Provident to Dr. Shiner or Les Jalouski about the significance of the monthly treatment notes themselves versus these very detailed narrative reports that Dr. Shiner was giving them. I think on at least four, maybe five occasions during that just two-year period, two-page, three-page reports from Dr. Shiner about the overall diagnosis, prognosis, treatment regimen, and everything that's going on. We have very significant medical evidence. But when you look at this act by Dr. Shiner, this refusal to provide the treatment, the monthly treatment notes themselves, you need to put it in context for what they knew at the time, what Provident was telling them about the significance. Because at no point in the record did Provident ever say, the failure to produce these could result in claim termination. Or the failure to produce these records will inhibit our ability to assess your credibility, Dr. Shiner, and therefore it could lead to potential adverse claim results. Here's what they did say, though, Judge McKeon. I mean, let's be a little bit fair to Providence here. They recognized Shiner had a concern. And so it seems to me that they proposed a workaround. They sent him a list of four, I think it was four things, that they wanted in lieu of the treatment notes. And I don't think he provided all of that stuff either. Well, here's what they said. And this is, again, at 3642. Reviewing physicians noted actual treatment records would be helpful. In other words, they're talking about Dr. Brown, who signed off on the final claim termination on appeal. Then they go on to say, if not available, we would be willing to review a summary, of which includes any changes in treatment, dates of services from the start of 2013 to present, and things of that nature. Well, they had that, either they didn't realize they had it, because that note at 3642 is literally within a couple weeks of probably Dr. Shiner's most detailed report in terms of the progress that Les Jalouski had made, the fact that he plateaued, the fact that he had major depressive disorder, chronic and reoccurring. All these things are in a report within a couple weeks of that letter, which I don't know if they crossed in the mail, but they're almost at the exact same time. So Les Jalouski and Dr. Shiner would have had every reason to think they were complying with anything that UNAM wanted. I assume you pointed that out in your appeal. Well, it wasn't to Provident. Provident never told us about it. This is all post hoc reasoning. It's not part of their termination letter. No, the letter is to Shiner. And you say, well, maybe Shiner didn't comply with what they asked for in the letter, but because he had already given it to them. Now, this is before the denial. Then you get denied. Then you appeal a denial to Provident. Did you point out, in fact, that they did have what they asked for? Not that it matters, but I was hired after all of this took place. I filed the lawsuit. Okay. Did the lawyer or whoever was representing them then point out what you're telling us now, that, gee, no big deal, because they already had that stuff? No, because we're talking about the final appeal denial. So it was too late. UNAM denied the claim. The appeal was then filed, and that's where the voc rehab report from Robert Ansell gets formulated. Dr. Shiner does a very comprehensive report. All that gets included with the updated record sent in. And then Dr. Brown, essentially relying on the IME that they did do, the one-hour IME by Dr. Dudley, upholds the decision to terminate benefits, and the game is over. So they didn't have an opportunity is the point, because that point was never made to them during the appeal process. All of the things that I'm asking you about I believe occurred before the initial denial. They were asked. Dr. Shiner was, of course, asked for his chart. There's no question about that. And he said no as to the progress notes. But had they said that if you don't provide those, your opinions will be given no weight, which is what happened with Judge Quist, he would have for sure produced those. There's no duty on their part to tell them that. It might have been nice, but no duty. Well, then in the alternative, what would? I want to go on to the second question before we run out of time here. It seems to me the biggest problem that the refusal to turn over these notes created was that the illegitimately independent doctors that looked at either did the evaluation or reviewed the notes afterwards said, look, if Steiner is correct, and he's making no progress whatsoever, then any psychologist, psychiatrist, whatever we're dealing with here, would have been changing the treatment plan. There would have been either more medication, more sessions, inpatient treatment, something. And presumably the explanation as to why when he doesn't get better for four years they don't change the treatment plan at all would have been explained in the medical notes, presumably. They were explained in Dr. Shiner's summary, and that is that he was stable. And there was an episode in 2011 where Mr. Jalewski himself took himself off his antidepressant meds and had a significant reoccurrence and was put back on the meds shortly thereafter, and that's all well on the record, too. So sometimes people don't get better from these conditions. And so Dr. Shiner, what he was doing is maintaining a patient in a very stable environment for that patient so long as he wasn't being plugged back into the very intense occupational requirements of his own occupation, which is what the policy... Judge Mary has a question. Yes, I'm sorry. When exactly was it that the insured here self-reported that he was feeling better, his daily activities had changed, and his mental health had improved? That was... When in this process did that occur? 2010, I believe. So it would have been July, approximately, that he was hospitalized. That would have been July of 2009. It was in 2010 that he starts making those reports. But again, in context, that's against somebody who is planning to kill himself. So what he's reporting is that he's able to take care of his activities of daily living. He's not socializing. His view of it after the insured reports that he's gotten much better is to the contrary. He doesn't believe that what the insured reported, self-reported, is correct, apparently. Is that right? No, I think that in context he did believe that what Mr. Jalewski was reporting was correct. The fact that Mr. Jalewski could make it through a day, we haven't even touched on the very significant social stressors that are in his life permanently, but the fact that he's been able to come out of this situation where he caught his wife cheating on him, where he didn't know if his severely adult disabled son was his son or not anymore, the same year they lost his business and the same year that his best friend died in his arms, and then he was going to kill himself and couldn't even get through a day. A year later, he's reporting that he feels 100% better, that he's getting through the day. He's able to start working out. He eventually starts playing tennis once a week and is trying to develop some healthy habits. In terms of interacting with other people, Dr. Shiner consistently reports in his narrative reports that he's unable to socialize with other people. He primarily stays alone. It's inconsistent. What the doctor says and what the patient says don't seem to jive. I think it's perfectly consistent when you look at the history of someone who got a lot better and then got to a point where he became, quote, stable, but he has severe depressive disorder recurrent and chronic, and that's the hallmark of the condition, and the best you can hope for sometimes is to be stable. Okay, counsel. Thank you. We'll hear from your other counsel. May it please the Court. I'm Andy Kordinga here on behalf of Provident Life and Accident Insurance Company. This Court has repeatedly held that a claims administrator need not defer to the opinion of a treating physician. This is especially true when the opinion of the treating physician is not supported by medical evidence, objective medical evidence. Here, Mr. Galewski's claim is based solely on the opinion of Dr. Shiner, and Dr. Shiner, as you know, refused to provide his treatment notes. Mr. Kordinga, how long could this policy pay? Up to 65, age 65. I don't know how old the claimant is here. He's currently 48. Whoa. Okay. So it would go as long time. Okay. That's right. And so this is a claim Mr. Galewski went on claim. The other policy was just a two-year. Two-year for mental health. Okay. A lot of these policies, as you may know. And this is disability, so yeah. A lot of them have a two-year limit on mental health. This one doesn't. This one potentially at least could pay to age 65. Did Dr. Shiner ever say that the best he could ever do is to stabilize this patient? No. I don't believe he ever said that. I think he said that the patient had stabilized but had not improved to the point. Dr. Shiner's position, he had not improved to the point of returning to work. The key to this case here is this is not a situation. You may have a lot of cases in ERISA where you have a treating physician saying one thing and then an in-house reviewer disagreeing. And this court has been critical of ERISA administrators for not getting an independent evaluation in situations where credibility is really at issue. Well, this is not a situation where we have a contest between a treating physician and an in-house reviewer. Unum went and got the independent examination, and the independent examination said this gentleman is ready to return to work. Unum could have stopped right there, but they didn't do that. I say Unum, I apologize. I meant Provident. Unum is the parent company. After they got the IME, Provident took that IME and sent it to Dr. Shiner and said, you're saying something different than the IME. We want to hear from you. What's your reaction to this? And they got the reaction, and then they took a next step. And they said, okay, we're going to take Dr. Shiner's reaction and we're going to send it to Dr. Dudley, the independent psychiatrist, and get his reaction. And they got that reaction. And at that point they said, okay, well, we have an IME that's well done, well-reasoned, and we have a treating physician's opinion that's not supported by the underlying records. We don't have the underlying records. And it's inconsistent with the self-reported activities. What do we do? Well, they credit the IME. But even then, Provident says to the claimant, if you will provide us with Dr. Shiner's treatment notes, we will reopen this claim and evaluate it again. Even at page 3643, this is the final denial letter that Mr. Haney was talking about, even then, when the final denial came through, Provident said, we'll give you a chance. Show us the treatment records so we can evaluate Dr. Shiner's opinion. And he didn't take that invitation. Did he actually affirmatively respond, I won't? He had earlier said that. I realized that. When he got his last chance. There's no response. No further response. Okay. That was the end of the correspondence. One final point here, because I know I'm the last person between you and the end of the day, or the end of the day for oral argument, at least. And for us, it's actually the end of the day. Okay. All right. In terms of Dr. Shiner's practice of copying the attending physician statement, changing the date, and sending that in, that practice continued for 18 months. The practice stopped when Provident said, we're going to get an IME. That's when Dr. Shiner stopped doing that. What did he do in response differently? What did he do differently? He did two things differently in response. After they got notice that there was going to be an IME, Dr. Shiner threw out the form differently this time. He changed two things. The first was the prognosis. For 18 months, Dr. Shiner had said that Mr. Jalewski's prognosis was good. Check. Good, good, good, good, good. As soon as they know there's going to be an IME, Dr. Shiner downgrades his prognosis to guarded with no explanation. There's one other change. The form that was filled out for 18 months straight, photocopied, he was asked the question, do you think there will be improvement in the claimant's functional capacity? For 18 months, Dr. Shiner said, yes, yes, yes, yes, yes, yes. As soon as they learned that there was going to be an IME, that changed. Is there going to be an improvement in his functional capacity? Check. No. No explanation. I think that says a lot about Dr. Shiner's role in this process. He was not acting as an independent evaluator. He was acting as an advocate for his patient. And that's one of the things that the Supreme Court in Black and Decker v. Lewis said is a potential issue in these kinds of cases. Unless the Court has any more questions, I'm going to stand down at this point. Thank you, counsel. Thank you. Thank you. I don't know if you have any more questions for me either. I would just point out that in that last letter where they gave Dr. Shiner one last chance, again, nowhere in the record are they telling Les Jalouski that this is going on, and that's really where their fiduciary obligation is to their insured, not to Dr. Shiner, to tell Les Jalouski, your doctor is not giving us these records. We need these records, and here's why. And without them, here's what's going to happen. That never happens. Les Jalouski is just cruising along. Why do you say there's a requirement to do that? Because they owe him a fiduciary obligation to keep him advised and to inform him under the DOL. There's no case support for this proposition. Is it in your brief? It is. It's the 29 CFR 2560. What they do for him is send him a check, but he knows quite well that that check is contingent upon his meeting the standards of the policy, right? Sure. Tell us what I mean. I'm just unfamiliar with that. There's several examples in the Code of Federal Regulations that talk about, and I believe it's 29 CFR 2560 that talks about, denial letters have to be formulated in a way that the average person can understand them. Now you're talking about the denial letter. I thought you were talking about the duty to give some advance notice that we might not pay you anymore. Well, I started out by talking about page 3642 of the record, which is the final denial letter, wherein this one last chance is apparently proffered to Dr. Shiner. It really wasn't a last chance for your records. It says that they might be helpful, or you can give us a summary, which he actually did do about two weeks before that. So he reads that. He just did. It gave them a very detailed narrative report doing exactly what they asked. And who knows when he would have received this appeal denial. This appeal denial doesn't go to Dr. Shiner. It goes to Les Chaluski. So who did the letter go to that said, we're giving you one last chance to submit the treatment notes? Did that go only to Shiner? No, that goes to Les Chaluski. That's his denial letter. And what it actually said is, the reviewing physician noted that treatment records might be helpful. I thought you were saying there was a breach of fiduciary duty here because Chaluski didn't know about this. He would never have understood that the failure of Dr. Shiner to produce monthly treatment records was putting his claim in jeopardy. Every other privacy that this man had had already been sent in to UNM. Why would he not want Dr. Shiner to send these progress notes? There's nothing in the record directly to Les Chaluski informing him that your doctor's not providing what we want. And reading this letter, it looks like Dr. Shiner did exactly what they asked for. Treatment notes might be helpful. But if not, send us a summary of what's going on. And that's what Shiner did. And of the two, to me, Dr. Shiner would have saved himself a lot of effort just sending in the notes. That's the easy thing to do. It's not like he was trying to take the easy road here. He's writing these very detailed narrative reports throughout the record. Every four to six months, basically, from 2011 to 2013. And the last thing is... Well, actually, your time has expired. And we, of course, have access to the whole record. Thank you. We will see that, counsel. Thank you, gentlemen, for their pre-arguments. We'll review your case carefully and issue an opinion.